1  ZACHARY CANTOR (SBN 270507)
   CANTOR LAW
2  1112 Montana Avenue, Suite C
   Santa Monica, CA 90403
3  T.    310.393.6620
   F.    310.393.6680
4  E.   Zachary@CantorLawyers.com
5
   Attorneys for Plaintiff  Shane Kisman
6

7              UNITED STATES DISTRICT COURT
             CENTRAL DISTRICT OF CALIFORNIA
8

9  **SHANE KISMAN, an Individual;**        CASE NO.

10           **Plaintiff,**                 **COMPLAINT FOR:**

11         **v.**                           1. **AGE DISCRIMINATION**
                                               [Gov't Code §§12940(a), (c) and 28 USCS § 1346, et.
12 **UNITED PARCEL SERVICE, INC.,**           seq.];
   **a California Corporation;**           2. **DISABILITY DISCRIMINATION**
13                                             [Gov't Code §§12940(a), (c) and 29 C.F.R § 1630.4];
           **Defendants.**                 3. **FAILURE TO ACCOMMODATE DISABILITY**
14                                             [Gov't Code §12940(m)(1) and 29 C.F.R §§ 1630.4,
15                                             1630.2(o)];
                                           4. **FAILURE TO ENGAGE IN THE INTERACTIVE**
16                                            **PROCESS**
                                              [Gov't Code §12940(n) and 29 C.F.R §1630.2(o)];
17                                         5. **FAMILY AND MEDICAL LEAVE**
18                                            **DISCRIMINATION AND RETALIATION**;
                                           6. **RETALIATION FOR COMPLAINTS OF**
19                                            **DISCRIMINATION AND HARASSMENT**
                                              [Gov't Code §12940(h) and 28 USCS § 633(a), et seq.];
20                                         7. **WHISTLEBLOWER RETALIATION**
21                                            [Violation of Labor Code § 1102.5]
                                           8. **WRONGFUL TERMINATION**;
22                                         9. **INTENTIONAL INFLICTION OF EMOTIONAL**
                                             **DISTRESS**;
23                                         10. **NEGLIGENCE**;
                                           11. **FLSA RETALIATION**
24                                             [ 29 U.S.C.S. § 215(a)(3)];
25                                         12. **WHISTLEBLOWER RETALIATION**
                                              [Violation of Labor Code § 6310 and 49 USCS § 31105]
26
27                                         **DEMAND FOR JURY TRIAL**

28

                              1
                         COMPLAINT

Plaintiff SHANE KISMAN, by and through his counsel, claims and alleges as follows:

**PARTIES**

1.      Plaintiff SHANE KISMAN (hereinafter "Plaintiff" or "Kisman") is a Fifty-Three (53) year old individual, who, at all times relevant to this action, resided in the County of Washoe, State of Nevada.  As a Teamsters Union Member, Plaintiff was subject to the Northern California Supplemental Agreement And National Master UPS Agreement. Plaintiff was at all times part of Local 533, which operates under this agreement; and Panel hearings were all conducted in California.

2.      Plaintiff is informed, believes and thereupon alleges that DEFENDANT UNITED PARCEL SERVICE, INC. (hereinafter "Defendant UPS" or "UPS") is an Ohio based Corporation, lawfully doing substantial business in the County of Los Angeles, State of California and was Plaintiff's employer at all times relevant herein. Defendant's Corporate Headquarters is located at 55 Glenlake Parkway NE, Atlanta, Georgia 30328.

3.      Plaintiff is further informed, believes and thereupon alleges that DEFENDANTS were and are Plaintiff's employer within the meaning of Government Code §§12926 (d), 12940 (a)(h)(1), (h)(3)(A) (i), and 12950. At all times relevant hereto, Defendant UPS exercised, directly and indirectly, substantial control over significant aspects of the compensation, terms, conditions, or privileges of Plaintiff's employment.

4.     Plaintiff is informed, believes, and there upon alleges that each Defendant is, and at all times relevant herein was, the agent of his, her, or its co-defendants, and in committing the acts alleged herein, was acting within the scope of his, her, or its authority as such agent, and with the knowledge, permission, and consent of his, her, or its co-defendants.

**GENERAL ALLEGATIONS**

5.      By this reference, Plaintiff alleges and incorporates herein each and every allegation set forth in all previous paragraphs of the Complaint.

6.      Plaintiff Shane Kisman graduated from Thousand Oaks High School in 1986.  Kisman attended Moorpark College 1987 through 1988.  Kisman moved to South Lake Tahoe in 1988.  Kisman has operated several businesses over the years.  Jet force Kawasaki, jet force Yamaha are businesses

that he maintained through the nineties.  Jet force Racine LLC would carry on into the 2000's.  Kisman would go on to run Mustang Motorplex, Chillcoot Motocross, Mason Valley Motocross and GFI Nevada a motocross race association.  Kisman closed the racetracks in 2011 but would keep the name GFI Nevada.  In 2015 Kisman and his son Zachary reopened GFI Nevada LLC.  Today GFI Nevada LLC is a thriving long haul trucking company servicing the west coast.

7.      During this time period Kisman maintained a fulltime position with UPS.  Kisman worked peak seasons for UPS during 1993 and 1994 as a package driver.

8.      On or about April 7, 1995, Kisman was hired as a fulltime package delivery driver. Kisman transferred to the Feeder division in or about 1996. His route for the five years prior to his termination was Reno, Nevada to Ontario, California—and almost all of his driving on the route took place in California. Many of his previous routes were also mainly in California. Kisman continued to be a semi truck driver until his termination in January 2021.  Kisman was terminated 50 days short of reaching his Peer 80 retirement in retaliation for his protected activities, including but not limited to his many complaints of illegal conduct.  Kisman's career with UPS lasted 28 years.

9.      Kisman was part of many activities promoting UPS.  From approximately 2012 to 2017, Kisman put on the UPS Reno Health and Safety fairs.  From approximately 2014 to 2017, Kisman was part of the UPS Reno Feeders Safety Committee at the direction of Phil Cote. Kisman also put on the UPS Golf Tournament, 1876 Reno Soccer Night, was a representative for UPS Career day at schools and assisted with the UPS Truck Rodeo. Kisman's help did not stop there. Kisman's son would do aerial photography for UPS and drive the NASCAR provided by Kisman giving all the kids and family's of UPS rides. Kisman's actions on the safety committee were always direct and honest—and he always called it as he saw it. He would bring up risks and be proactive to eliminate risks before they became injuries. UPS, however, was reactive and then tried cover up what had been done. Kisman and UPS did not see eye to eye on safety. Kisman, therefore, stepped down from his participation on the safety committee in 2017 and chose to not put on any more health and safety fairs in 2018.

10.     By 2018, safety issues at UPS had been getting worse and worse. Kisman again reached out to UPS writing a letter to management regarding safety of their trucks. On or about February 15, 2018, Kisman submitted a letter to management (specifically giving it to Lita Brooks) regarding the

safety of UPS trucks.  The letter Kisman submitted described the communication problems between feeder management and the shop.  Kisman also explained how the tractors were red tagged for safety concerns (meaning they should not be operated until fixed), but were still put back on road without the repairs being completed.

11.    Kisman's concern for the lack of safety by UPS was very real.  Even more concerning was the fact that UPS management team was aware of the violations and continued to place the equipment back on the road endangering its employees and the public in which they operate.

12.    The very next day after he submitted the complaint letter about safety concerns, Kisman received a text message the from Feeder Division Manager, Phil Cote, asking if Kisman was going to put on the UPS Health and safety fair for that year (2018). Kisman responded that he was not. Kisman, Lita Brooks, and Phil Cote spoke later that week; and Phil Cote responded to Kisman's complaint by explaining how the shop and the management team had a great line of communication. This statement by Phil Cote was false. Both dispatch and the shop continued to throw each other under the bus daily.

13.    On or about March 15, 2018, Kisman arrived to work only to find a full-page letter taped to the inside middle of his windshield with package tape. The note was in black marker and read "STOP PARKING YOUR TRACTOR IN FRONT OF THE SHOP BAY DOORS AND LEAVING! - TROY YOUR COWORKER". Kisman was frustrated after seeing note, because the tape would not come off the window without leaving the glue behind. Kisman proceeded to the shop to get a razor blade and find out who Troy was. After removing the tape and being very late for his run, Kisman went into shop manager's office and asked Frank Abrott who Troy was. Jeff Berg and Frank were both in the office; Frank replied his tool box was right outside of window. Kisman said he was going to tape the note back on Troy's toolbox with his response "OK".

14.    Frank blew up and said Kisman could do no such thing. Kisman and Frank argued and finally Kisman in frustration threw his arms up, walked away, and said, "Fuck off." Frank chased Kisman out the door saying, "I'm ordering you too stop." Trying to de-escalate the situation, Kisman kept walking. Frank then said, "I'm giving you a second order to stop." Kisman stopped, and Frank ordered him back to his office. Kisman went back to his office, and Frank called up to dispatch telling them to cover Kisman's run because Kisman was fired. Kisman was sent back to dispatch, and no one

knew what to do with him—and so they had him wait in an office. Kisman ultimately received a 10-day suspension for saying the word "Fuck."

15.     On or about April 10, 2018, Debbie Calkins wrote a letter to Phil Cote regarding Kisman's run times, schedule, service and speed. These were all the same issues during the prior three years that the company knew it was wrong on but would not address.

16.     On or about June 7, 2018, Kisman filed grievance against Nick Paneli and Robert McCrea for continued harassment/retaliatory behavior.

17.     On or about September 6, 2018, Kisman obtained a letter between the shop and Nick Paneli re turning up a truck from 66mph to 73mph. Obviously UPS needed drivers, including Kisman, to drive faster, as that was the only way to make service.

18.     On or about September 14, 2018, Kisman completed a new Department of Transportation (DOT) physical.

19.     On or about September 18, 2018, Kisman arrived at work, turned in completed DOT paperwork to Jamie Castleberry, and he started work.

20.     On or about September 19, 2018, Castleberry woke up Kisman by phone during his rest period informing him that his DOT physical was not filled out correctly, and he could not drive. Kisman waited for management to instruct him what to do. Kisman only had a couple of hours sleep at this point, and was instructed to call Ontario to get DOT locations so Kisman could get a new DOT physical. Kisman was waiting for a hotel shuttle to take him to Concentra across town in Ontario when Robert McCrea texted him saying, "you are good." Robert McCrea sent Kisman a copy of new DOT physical, but it was clearly falsified. McCrea then instructed Kisman to drive.

21.     With little to no sleep, Kisman was put back on duty to drive. Kisman returned to Reno and had to go to DMV at Robert McCrea's request to file a DOT physical. DMV denied allowing Kisman to file forms, because the forms clearly had been altered. Kisman notified UPS and was told to go back to Renown to have a doctor update the physical. Renown refused, and after over an hour had Kisman wait to complete new DOT physical. Kisman completed the physical; and UPS instructed Kisman to bring a copy of the physical to UPS, then go file with DMV. Kisman's day did not end until after 1pm.

22.     Kisman called to let UPS know that he was going to sleep, but had not been to sleep in over 48 hours. Kisman slept for 2 hours, and wakes feeling exhausted. Kisman tried to call in and use a sick day, as he was exhausted and tired from lack of sleep. Kisman tried to call in 3 times, but Nick Paneli forced him to come in—as Nick said UPS did not have anyone to cover his run. Kisman struggled, but made it back to Ontario only to have Lennie Heinz wake him up to help with the IVIS screens not working on the ELDS properly. Kisman extremely exhausted attempted to log in, but was unable to get the IVIS to work. Kisman finally got logged in, and went back on the road.

23.     Kisman had to pull over three more times, as he was so tired—and felt unsafe. Kisman got off work and had Jamie Castleberry edit his time card with the correct start time, as he was unable to punch in.

24.     On or about September 22, 2018, Kisman headed to a FMCSA meeting being held in Reno, NV. Kisman and his son Zach attended meeting; and at end of the meeting, Kisman was able to address the much needed safety concerns re UPS, including but not limited to use of red-tagged equipment and wage and safety violations related to unsafe route completion times from Reno to Ontario, CA. Several of the top officials were present, and were shocked to hear what Kisman disclosed. The FMCSA representative pulled Kisman to the side and gave him his card, and instructed Kisman to contact him later. Kisman's complaints at the FMCSA meeting were disclosed to UPS.

25.     On or about September 25, 2018, Kisman arrived at work and was met with a whole group of people waiting to have a meeting. Robert McCrea, Joe Rogers, Phil Cote, Debbie Calkins and Kisman go into a meeting. Kisman is accused of dishonesty and theft of time, and was discharged. This was just three days after Kisman discussed safety issues with FMCSA. Kisman also received a warning letter for failure to follow safe driving methods. This action was for Kisman being called in over the prior weekend to help out.

26.     On or about September 26, 2018, Kisman received a discharge letter re the meeting that was held on the day before.

27.     On or about September 27, 2018, Kisman received a warning letter for failure to follow safe work methods.

28.     The message was very clear: DON'T MESS WITH UPS. This was just the beginning of

the retaliation and harassment.

29.     In or about November 2018, Kisman had a three-hour meeting with FMCSA Jerry Calderon at the Federal building in Carson City, NV.

30.     On or about December 4, 2018, Kisman filed grievance to be made whole for time off, storage fees, and expenses owed to Kisman by UPS for past safety fairs he had organized. The same day, the Panel hearing took six hours in Northern California; and Kisman was reinstated. UPS was ordered to pay storage and expenses, but did not make Kisman whole for time off.

31.     Outside of the Panel room, a meeting was held by Lori UPS labor, Debbie Calkins and Kisman. It was decided that there would be a meeting upon Kisman's return to work, but Debbie Calkins was leaving town for a Wedding in Hawaii. Debbie's first day back was scheduled for December 13, 2018. It was also agreed to have Kisman not receive any compensation from Kisman's GFI Company, as to not have any conflicts over "working"—and if he was not receiving compensation then he would not be considered to be "working." Kisman was to fill out logs for compensated work only.

32.     The UPS management team was furious, and was already causing problems before getting back to Reno. Kisman immediately received four 72-hour warnings and one dependability letter; and UPS management threatened to terminate him before he even returned to work.

33.     Upon his first day back, all his personal tools had been stolen. Kisman received another warning letter on or about December 17, 2018 for being absent from work, even though UPS docked his sick days while he was out. Kisman filed four more grievances for harassment and a retaliation grievance for use of FMLA leave. UPS then withheld his pay for Christmas week and his check was $0.

34.     On or about December 26, 2018, Kisman filed an OSHA complaint for retaliation after making safety and labor complaints to FMCSA.

35.     On or about December 28, 2018, Kisman received a warning letter, and UPS attempted to issue a five-day suspension for a day he had off. UPS management again threatens to fire Kisman.

36.     On or about January 15, 2019, Kisman filed another grievance to be made whole for storage and expenses. Lori of UPS Labor met with Kisman and Debbie Calkins, and resolved all grievances so that they do not go back to Panel. It took until March 2, 2019 for Kisman to receive his

wages from Christmas week 2018.

37.     On or about March 28, 2019, Kisman received a large packet from the UPS attorneys Jackson/Lewis using all the settled grievances against him.

38.     On or about April 17, 2019, Kisman received his penalty pay that UPS was required to issue for the grievance regarding its failure to pay his wages Christmas 2018. UPS still had not issued reimbursement payments for Kisman's Fair expenses or storage costs.

39.     Having been defeated at its initial retaliatory attempts to get rid of Kisman, UPS would attempt no other adverse actions until July 2019, after Kisman's next safety complaint.

40.     On or about July 22, 2019, co-worker Kendall Harris passed away. Kisman arrived at work on or about July 23, 2019, and he learned of Kendall Harris's death. Kisman had known Kendall for a long time. Kisman asked management what happened, and multiple managers stated that Kendall died from a drug overdose and possible suicide. Kisman was very upset, because he knew how Kendall was being treated by management in the days leading up to his death.

41.     Kisman walked outside to find his tractor and saw Andrew a UPS dispatcher. Kisman told Andrew to remember last week when Kendall told us what was happening. Kisman told Andrew to just be honest and not to let Phil Cote make him misrepresent the facts.  Kisman went to his tractor and placed a call to the Head of UPS HR, Herb Garret, and Herb said all the information Kisman was told by management was false. It was clear once again UPS was about to cover up another safety violation.

42.     Later that night Debbie Calkins called Kisman while he was driving to tell him that Phil Cote had just called her and said that she needed to get Kisman under control before "he goes ballistic on Kisman." Kisman took Phil's threat seriously, as Phil is an avid gun enthusiast, owns multiple weapons, and had participated in the multiple retaliatory actions to date.

43.     Over the next week several employees came forward, and it became clear Kendall had needed help while at work and was denied the medical treatment. As a matter of fact, UPS Management had been called for two hours before Joe Rogers showed up; and rather than take Kendall to a hospital, UPS dropped him off at home where he died. Kisman filed a police report for wrongful death and several grievances on Kendall's behalf. UPS HR representative, Herb Garret, flew into Reno and had Kisman meet with him.

44. On or about July 29, 2019, it was Kisman's day off; and Kisman was sent information for Kendall's wake at his family's relative's house, and planned to attend. Many UPS co-workers were planning to attend. Kisman called two other employees on day of wake to see if they were going. Kisman ultimately went to the wake by himself.

45. As Kisman arrived and walked on the sidewalk towards the home, Phil Cote walked from the front of the house onto the sidewalk and physically blocks Kisman from continuing walking toward the house, saying to Kisman, "you are not welcome." Kisman tried to continue walking toward the house but his chest bumped into Cote's, as Cote continued to physically obstruct Kisman's ability to move past him. Unbeknownst to Kisman, Phil Cote already had the police on the phone (and had arranged for them to come to the scene before Kisman had even arrived). Kisman waited one driveway away, as he did not want to leave understanding that the police were on the way.

46. Upon Police arrival, video is shown to an officer of Kisman continuing to walk while Cote physically obstructed his path, resulting in Kisman's chest bumping into Cote's chest. Kisman was arrested, and spent the night in jail. It was not until days later when police body cams were reviewed showing UPS manager Phil Cote had been planning this altercation for days before. This was Retaliation for Kisman filing safety complaints.

47. While Kisman was being arrested, UPS Larry Powers was taking video from about six feet away; and the (incomplete) video was shared at work by UPS Reno management. This same video was sent out to past employees all in an attempt to further harass and damage Kisman's character by Phil Cote. Kisman filed additional harassment and retaliation grievances along with false imprisonment and defamation of character grievances.

48. Kisman was on his scheduled vacation the week after the wake—through the week ending August 10, 2019.

49. On or about August 8, 2019, Kisman received a discharge letter for alleged inappropriate conduct and violation UPS anti-harassment policies from Phil Cote.

50. On or about August 14, 2019, Kisman returned to work with yet another meeting awaiting him. This meeting is being done conducted by Khrystal (UPS HR) and Ian (Hub supervisor). Kisman noticed a shop steward from the hub in Robert McCrea's office, and she is being shown video

from Kisman's arrest.   During the meeting Khrystal read the UPS anti-harassment policy and Retaliation policy to Kisman. Kisman agreed to sign them, as he states he is the only one following the policies. Kisman also asked Khrystal if all the other employees were being required to sign these policies as Kisman was at that time. Khrystal says, "no." Kisman pointed out that he was off duty during the wake, and unless everyone else was going to sign these policies it appeared Kisman was being singled out and retaliated against even further.

51.     Ian took over the meeting and began to read the discharge letter penned by Phil Cote; and Kisman then asked some questions in regard to the letter. Ian became irate telling Kisman that he does not have to answer any of Kisman's questions, and Ian stormed out of the room. Kisman then asked shop steward, Heather, who was shown video of Kisman by Robert McCrea to go back to Robert's office and ask to see video with Kisman present. Robert McCrea denied Kisman, stating that it was Phil Cote's property and Kisman could only see it if Phil said it was ok. Even Heather, the shop steward, was shocked that Kisman was not allowed to see the same video that Robert had just shown her and others.

52.     Kisman filed four more harassment/retaliation grievances during August and early September 2019.

53.     On or about September 12, 2019, Kisman's mother had brain surgery, and Kisman was forced to take FMLA Leave of Absence. Kisman notified dispatch about his mother and filed FMLA request from. UPS, knowing why Kisman was out on FMLA leave, sent Kisman a 72-hour warning letter notice re missing from work.

54.     On or about September 25, 2019, UPS sent a discharge letter for the 72-hour notice. UPS also sent a discharge letter for job abandonment/failure to respond to 72-hour notice, and a third discharge letter for unauthorized leave of absence and alleged undependability.

55.     Kisman was being harassed and retaliated against while taking care of his mother on FMLA Leave by UPS Phil Cote. While Kisman was on FMLA leave taking care of his mother in Thousand Oaks, CA, he filed three more grievances for harassment, FMLA Discrimination/Retaliation, and defamation of character.

56.     On or about November 19, 2019, Kisman received a discharge letter for undependability

for absent day.

57.    During December 2019, meetings were held between UPS HR, Debbie Calkins and Kisman. Polly Antes sat in on two of these meetings. UPS agreed to drop all the discharge letters, though UPS contended the letters were only issued per standard procedures. In fact, these letters were only dropped because they were wrong to begin with. The harassment/retaliation by UPS and undue stress put on Kisman while trying to take care of his gravely ill mother were overwhelming and neither the hospital, the insurance nor his family could believe what they were witnessing while Kisman was on FMLA.

58.    Next, UPS wanted Kisman to drop all of Kisman's grievances. Kisman did drop several, but refused to drop the majority of them. UPS then wanted to resolve the past monies that were owed to Kisman, especially since a Panel hearing was coming up again and UPS had still not paid the fees as ordered to do so at the December 4, 2018 Panel. Over a year later, UPS finally agreed to pay three checks totaling $2,744.00; but now refused to pay Zach Kisman for any of his time, as promised by Phil Cote.

59.    On or about December 20, 2019, UPS sent a discharge letter to Kisman for alleged undependability when Kisman used a FMLA day, and a second discharge for being one minute late to work. Kisman subsequently filed a grievance for both letters re FMLA harassment/discrimination and FMLA retaliation.

60.    On or about December 26, 2019, Kisman filed a grievance against Larry Powers for use of the word "Fuck" over and over in reference to one of his coworkers. Kisman had approached Larry Powers and asked if he would not say it over and over, as Kisman had been terminated earlier that year for saying it once. Kisman went on to file three more harassment grievances. One of the grievances was for UPS alleging Kisman was late when in fact he was not. The other grievance was for giving away his run while he was doing a mandatory random drug test at the company's request. UPS had another driver hook up the trailers, even though Kisman was in contact with dispatch letting them know what was happening with the test from downstairs. Kisman even met the driver and was ready to go, but the driver was told to take the loads anyway and leave. Kisman filed an additional grievance against Mike Stenson for this incident.

61. January 2020 ended with pre-panel meetings in which the company had dropped all of their discharges, and the union still went forward with a bunch of grievances on Kisman's behalf.

62. On or about February 5, 2020, Panel began and UPS was able to call "point of order"; and the panel never got to hear what was actually occurring. At one point an actual Teamster Panel member came over to Kisman and apologized, and said the Panel could not believe all these things could possibly happen. All of the grievances were thrown out, as nobody could possibly imagine one person going through all this harassment and retaliation.

63. When this Panel ended, Kisman lost faith in the panel process and realized that the system did not allow the truth to actually be heard. Once again UPS was allowed to harass and retaliate beyond anyone's imagination. Things calmed down until July of 2020.

64. In or about July of 2020, Kisman notified UPS about trailers that were being falsely out-bounded by dispatch. They continued to falsify the trailer outbound times in order to make it appear that they were being loaded and put on road in a timely fashion—which was false.

65. During the same time period, UPS had required its employees to use a separate app from their cell phones in order to show that the employees were able to work that day and had no symptoms of Covid. The State placed into a effect a mask mandate, and OSHA was enforcing the new work rules and regulations in order to keep the employees safe.

66. The UPS management team refused to wear masks and continued to call upon its employees to come into closed door meetings in offices where six-foot distancing was not possible. During these meetings, the managers would not wear their masks, exposing employees to everyone that the managers had come into contact with that day—and possible Covid infection. Kisman personally came to work each day wearing a mask and gloves, and followed the OSHA guidelines to a T.

67. In early July 2020, Kisman was asked to meet with Larry Powers in the on-road managers office. During this meeting, they discussed completing the DOK's in a timely fashion. Larry asked Kisman to complete them by the end of the week. Kisman asked Larry Powers why it was so important to complete the DOK's regarding safety and yet he was refusing to wear a mask protecting Kisman from all the other employees that he had been in contact with during his day. It was shortly after this meeting that Larry Powers was out of work for possible exposure to Covid. Kisman was not

notified by UPS, but rather told by an hourly employee that Larry was out on Covid leave.

68.    Upon hearing this news, Kisman asked Robert McCrea (on-road manager) if this was true.  Robert said that Larry was on vacation.  Unfortunately, Robert lied to Kisman, and Larry Powers was actually on Covid leave.  Kisman was very upset that UPS had failed to follow the rules and guidelines set forth by the CDC and OSHA.

69.    When Kisman arrived back to UPS after completing his shift, he told dispatch that he did not think it was right that they were being lied to and being placed at risk of contacting Covid—and exposing their families and fellow employees and the public.

70.    On or about July 8, 2020, Kisman completed a 48-minute intake call with Robert Gillings of OSHA.

71.    On or about July 13, 2020, Kisman received a confirmation letter from OSHA confirming the complaint that Kisman filed with them.  Kisman contacted his doctor, and  informed her that Kisman may have been exposed to Covid and explained the circumstances.  The doctor instructed him to self-quarantine, and that they would call him and schedule Covid testing.  The first available date was July 23, 2020.  Kisman then notified UPS that his doctor was scheduling him for Covid testing due to possible exposure from Larry Powers.

72.    Kisman reported to the Renown lab for testing at the USA Parkway location, and waited in his car and completed the first Covid test. The lab technician said when Kisman got the results, he was to call and set time to come back for second testing and blood draw.

73.    On or about July 24, 2020, Kisman received a phone call from the UPS nurse Charlotte. She stated that she had been asked to call by Robert McCrea, but was not sure why. Kisman told her that he was out for Covid testing and perhaps that was why. They spoke about what his doctor was doing, and she asked Kisman to complete some forms in order to be paid for time off. Kisman did not complete the forms or ask to be paid, as he did not trust UPS actions.

74.    Kisman had completed second testing and received results late Friday from Renown. Kisman called to set up appointment with his doctor for Monday, July 27, 2020, so that he and the doctor could review results and be given a return to work notice. Kisman no longer had to quarantine as of 4:30 pm on Friday.

75.     On or about Monday, July 27, 2020, Kisman drove a van down to Boxington and got in one of the GFI semi trucks and pulled an empty trailer that Kisman had been storing his personal items in from Vista storage. The trailer rental renewed each month on the 1st and Kisman new he would not be in town to return the trailer as Prime Trailer is only open Monday thru Friday. Kisman dropped off the trailer at Prime Trailer, which was about one mile away, and as Kisman was leaving he noticed a blue car that appeared to be following him. Kisman drove to ODL where GFI had another trailer, and switched out a tracking device as the batteries were low. He then headed back to Boxington about two miles from ODL. Kisman noticed the blue car following him again.

76.     As Kisman turned on to Boxington, the car went straight but made a u-turn and came down the street. Kisman parked the semi truck and got into the van, and noticed the blue car had pulled into a parking spot at the storage facility. Nobody got out of the car. Kisman then drove the van over to the facility and blocked the blue car in. Kisman approached the driver's door and knocked on the window, the driver rolled down the window about two inches. Kisman asked the driver what seemed to be the problem and why was he following Kisman. The driver lied to Kisman at first, and then gave Kisman his friend's phone number to confirm his story. His story did not add up.  Kisman called 911 and waited for the police to arrive.

77.     After the police had interviewed the person following Kisman, they could only tell Kisman that he was a Private Investigator doing his job.  (Kisman did not know for sure until August 4, 2020, when Kisman obtained the body cams from the officers; the individual following Kisman had been hired by UPS, and the body cams confirmed it.)

78.     Kisman went about his day and completed his doctor's visit in order to have all restrictions lifted and receive a return to work notice, so that Kisman could go back to work on Tuesday July 28, 2020.  Kisman called Anthony at UPS and told Anthony that he would be returning to work on Tuesday.  Anthony told Kisman that he had to get clearance from the UPS nurse in ordered to return to work.  Kisman placed a call to the nurse, Charlotte, on July 27 at 2:43 PM and left Charlotte a message telling her that he was cleared to go back to work.  Kisman left the UPS nurse, Charlotte, another message July 28 at 6:41am again stating that Kisman was returning to work that day Tuesday, July 28.

79.     The nurse, Charlotte, finally returned Kisman's call at 9:59 AM.  Charlotte indicated

that she had to receive the note from the doctor in order for Kisman to be put back into the schedule.

80.     After multiple failed attempts, Kisman was finally able to use Kisman's son's telephone to forward Charlotte a copy of the doctor's note.  Shortly after the nurse receiving the doctor's note, Kisman got in his car and drove to the grocery store to buy some snacks for his drive to Ontario, CA that night.

81.     Kisman was not aware that the UPS investigator had followed him into the grocery store and was taking pictures of Kisman shopping inside of the store.  Kisman left the store and drove home to get a couple of hours of sleep before the start of his shift.

82.     Upon arriving at UPS, Kisman was immediately told to wait, as management had to have a meeting with him.  A few minutes went by and Kisman noticed Jeremy Cox come up the stairs—and was going to be Kisman's shop steward.  It was at this moment that Kisman realized that the person following him the other day was most likely a private investigator for UPS.  The meeting was held with Mike Stenson, Jeremy Cox and Kisman.  Mike Stenson explained that Kisman had two working discharges.  He explained what the discharges were for. Mike Stenson also claimed that he had no knowledge of what was happening with Kisman being followed and that Mike Stenson was only a middleman. Mike Stenson continued to get up and leave the room in order to get answers to questions. Mike Stenson was unable to answer most of Kisman's questions; and Kisman even presented the OSHA letter, as Kisman knew there would be retaliation on behalf of the company as there always was.

83.     Kisman was very upset, and asked Mike Stenson about the company's EAP program. UPS had already covered Kisman's Run.  After several minutes Mike Stenson was able to find a flier in regards to the EAP program and gave it to Kisman. This meeting lasted well over 2 ½ hours.

84.     Kisman contacted the EAP program the following day.  He did two 30-minute sessions with the 800 number prior to finding a local counselor who Kisman could see from the counselors provided sheet.

85.     Anne Carter-Hargrove, PhD, MFT was who Kisman began having counseling sessions with.  The counseling sessions were done via Zoom and by phone due to Covid restrictions.

86.     On or about July 31, 2020, Kisman received two discharge letters.  Kisman then filed a new complaint with OSHA on or about August 2, 2020 for the retaliation and relating it back to his

original OSHA complaint.  This retaliation had become the standard at UPS.  And the resulting stress, depression, and anxiety had begun to take a significant toll on Kisman's health.

87.     On or about August 10, 2020, Kisman went to his doctor only to find that his blood pressure was now very high at 142/90.  Kisman began to feel very rundown, tired and low energy. Kisman's doctor asked him to monitor his blood pressure and to let the doctor know if it continued to be high.

88.     On or about August 11, 2020, Kisman received an e-mail regarding the OSHA complaint that he had filed on July 8, 2020.  Kisman again was experiencing blood pressure issues.  He went to the doctor's office, but this time his blood pressure was 165/105.  After sitting still and three attempts the blood pressure was at 158/100.  The doctor wanted Kisman to start taking his own blood pressure readings in the morning at noon and at night.  Kisman was now having difficulty sleeping and found himself watching for any and all strange vehicles that may be following him.

89.     On or about August 14, 2020, Kisman received another confirmation letter from OSHA in regards to case number ECN63771.

90.     On or about August 19, 2020, Kisman arrived at the hotel in Ontario, California only to see a strange vehicle with somebody inside watching him.  Fellow driver Saul Diez arrived at the same time and also observed the vehicle.  Kisman notified the hotel upon check-in of the situation.  Kisman entered his room on the second floor and was able to watch the vehicle from the window. He was unable to sleep, and worried that the man in the car was there to sabotage his truck. When Kisman returned to Reno, he told Mike Stenson what was happening and asked him to please stop following him. Kisman explained how this was really taking a toll on his health; and that he was not able to be as safe, because he was watching behind him more than in front.

91.     Kisman was having meetings now two times per week with the counselor. The counselor asked if he had sick days available and told him that he needed to use a couple; so he did.

92.     The next week, on or about August 24, 2020, Kisman received two more discharge letters for calling in sick. Kisman's stress level and anxiety was at an all time high.  He was unable to sleep, was hearing noises in the middle of night, and worried about his job at UPS.

93.     Kisman's counselor was shocked to see that he was being fired for using sick days that

he had on the books per her guidance. Kisman again went back to his doctor on or about August 25, 2020, and this time his blood pressure was high 142/98; and the doctor did an EKG. Due to Kisman's increased stress, the doctor was worried that the left side of Kisman's heart was enlarged and was stress related. The doctor thought that Kisman had signs of Bradycardia. The doctor ordered an Echocardiogram and set the appointment. The doctor also prescribed Lisinopril to help lower Kisman's blood pressure. The doctor warned him to keep a close eye on it and that continued high blood pressure could cause a stroke.

94.     On or about August 26, 2020, Kisman had a follow up doctor's appointment and a DOT physical. Kisman was barely able to pass physical on the blood pressure. It took three attempts; and Kisman used techniques that the counselor had taught him through "head space"—a program the counselor had him doing to help calm him down.

95.     On or about August 27, 2020, Kisman returned to work to start his day. Again, he was instructed to wait for Jeremy Cox, as Kisman was having another meeting. Jeremy Cox arrived and spoke to Kisman briefly before Robert McCrea had Jeremy Cox step into his office. After several minutes, Jeremy Cox came out and said that Robert McCrea was sending Kisman another discharge for his use of a sick day. Jeremy also stated that Robert McCrea was not going to allow Kisman to talk. Jeremy Cox and Kisman entered the office, and Robert McCrea read him another discharge letter. Kisman tried to tell Robert McCrea why he was out on sick time, but Robert McCrea refused to hear anything. Robert McCrea only stated, "That's all the business I have, and you can go to work."

96.      This was continued retaliation for Kisman's safety complaints. Note: during this meeting, Kisman again was wearing a mask and gloves and so was Jeremy Cox; but Robert McCrea did not. This is exactly what Kisman's July OSHA complaint was for to begin with. This was nothing more than messing with Kisman's mind, as UPS management already new he was seeing a counselor and having health issues. This was what UPS would do before Kisman would get in the truck and drive 470 miles to Ontario, CA. It would make coming to work miserable and clearly would demonstrate that UPS had no intentions to follow the OSHA guidelines.

97.     Kisman completed the job arriving in Ontario, CA and went to the hotel. Upon starting his next shift on Friday, August 28, 2020, Kisman noticed a black Chevy suburban backed into a

parking spot; and as Kisman exited the hotel he could see the man in the vehicle hold up his phone as though he was taking video of Kisman. Kisman used his phone to snap a photo of the vehicle the man was in. Kisman drove to the center to pick up trailers. As he backed under the trailer, he noticed a man watching every move he made. Kisman completed hooking up and doing his pre-trip inspections, and got back into the cab.  Kisman started the truck and was preparing to leave as he noticed the man walking towards his truck.

98.     As the man approached the vehicle, he walked down the passenger's side and went behind the trailer. Kisman checked both mirrors but did not see him come out from either side. Kisman got out of the vehicle and walked to the rear of the trailer. As Kisman came around the back of the trailer, the man had opened the rear roll up door and had his arms inside the trailer.  Kisman immediately asked what he was doing. The man stated he was not sure and walked away. Kisman was blown away, and had never felt so unsafe in his life.

99.     Kisman called Ontario's dispatch team and sent them photos of the man, and they did not know who he was. Kisman called Reno's dispatch team and told them what had just happened, and they did not care either.  Kisman was so scared that he texted the photos to Saul Diez, his son and his mother.  Kisman also included a photo of the seal control record and trailer number. UPS's games had now entered a new high.

100.    Kisman departed Ontario and headed back to Reno. Kisman was truly worried that something was about to happen all evening. No one from Reno's management team ever responded to Kisman in regards to what took place.

101.    On his scheduled day off, August 31, 2020, Kisman noticed a tan Chevy pick up had parked in the dirt lot and was observing Kisman. Kisman took a photo of the vehicle and left the area. Even on his own personal time, he could not get away from the UPS harassment.

102.    On or about September 2, 2020, the same unidentified man followed Kisman while in the Ontario UPS yard. This went on for a couple of days, then Kisman did not see him anymore. The counselor wrote a letter for Kisman to give to UPS in hopes that UPS would back off. He gave this letter to Mike Stenson when he returned from Ontario.

103.    Not only Kisman but many employees were having difficulties punching in. The

problem had been ongoing.

104.    On or about September 3, 2020, Kisman had to wait for Ivis to allow Kisman to log in. He would get copies of timecards to be very clear as to what was going on. Dispatch continued to falsify his loads showing that he had left, but in fact he was still there. Things seemed to calm a bit after counselor's letter.

105.    On or about September 10, 2020, Kisman was told by his doctor that he could stop with daily blood pressure readings at home, as the medication seemed to stabilize his blood pressure.

106.    On or about September 15, 2020, Kisman received a message from Brian Morgan (OSHA Investigator) that UPS OSHA case was moving forward and that Brian Morgan wanted to do another intake session.

107.    On or about September 18, 2020, Brian Morgan did the intake for the UPS OSHA case. Brian said he was expanding the scope to include everything through the present. Kisman spent weeks copying and getting documents together for him based on a much larger date range.

108.    On or about October 5, 2020, Kisman had a doctor's follow up for blood pressure: 128/70.  Kisman was continuing to see the counselor on a weekly basis as well.

109.    On or about October 29, 2020, Kisman arrived at work only to have the biggest argument of his career. Again, the Ivis time keeping system locked up during punch in, and Kisman told Michelle about it. Kisman had arrived at work on time, but was asked to have a meeting. Kisman waited for 30 minutes for Deaconn to arrive. At 5:30, Kisman went into the on road supervisor's office, which had Larry Powers, Larry Cooper from management, Deaconn Spurlock shop steward and Kisman. The meeting started off with Larry Cooper asking why Kisman did not complete the DOK's and implying that Kisman did not want to be safe. Kisman had 23 years safe driving awards—and had a proven track record of being very safe. The meeting went sideways very quickly as the conversation changed from the DOK's to UPS wanting Kisman to sign anti-harassment papers and retaliation papers. Kisman was clearly upset and he could feel his chest pounding and was short of breath. Kisman felt like he was in the hot sun and light headed. Kisman asked if someone could check Kisman's blood pressure. This occurred at 5:45pm.

110.    Kisman was left alone as Larry Cooper, Larry Powers and Deaconn Spurlock went into

Robert McCrea's office. They were in there for just over ten minutes. Deaconn came back into the room and asked Kisman if he had taken pictures of Larry Cooper at his other job at Home Depot. Kisman replied, "No." Deaconn Spurlock then asked if Kisman had followed Larry Cooper and Larry Cooper's pregnant wife taking pictures of them. Again Kisman said, "No." Deaconn told Kisman that this is what Larry Cooper was stating and that Kisman used this information in a grievance case with Debbie Calkins Union leader and Jeremy Cox shop steward. Of course, this never happened; and now Kisman was even more upset at being falsely accused and having his reputation smeared with outright lies. Larry Cooper also stated that he had filed a police report against Kisman for Kisman's alleged actions.

111.    Deaconn Spurlock explained that this is why they wanted the retaliation and harassment paperwork signed by Kisman. Larry Cooper never came back into the office. Deaconn Spurlock told Larry Powers that Deaconn Spurlock would take Kisman down to the break room and wait for them to have someone check blood pressure. UPS management said they had someone coming. With Kisman's chest pounding again Deaconn Spurlock asked if Kisman was alright, as his face was bright red. Deaconn Spurlock and Kisman headed down to break room.

112.    Nobody ever came to check Kisman's blood pressure. All Kisman could think about was the doctor telling him to be careful and not let his blood pressure get elevated.

113.    At 6:15pm Kisman texted Debbie Calkins who was already at UPS asking Debbie Calkins to come help. Debbie Calkins came to the break room and shortly after made a call to Phil Cote. UPS did nothing to help Kisman get medical attention; rather, they delayed Kisman from getting proper medical treatment in a timely manner.

114.    At 6:30pm Debbie Calkins told Phil Cote that Deaconn Spurlock was going to take Kisman to the Hospital to get a blood pressure check, and that Kisman said it was work comp related. Phil Cote told Debbie Calkins that it was not work comp related.

115.    Kisman's blood pressure was not checked until 7:31pm—1 hour and 45 min from time of request. Kisman's blood pressure was still high at 139/86. Kisman was sure it was much higher earlier. The doctor examined Kisman outside of the front lobby, as they had several Covid patients inside. The doctor was considering admitting Kisman, but could see that the echocardiogram was

scheduled for the following Wednesday (11-4-20); so he let Kisman go and cautioned Kisman to keep a close eye on blood pressure.

116.    Deaconn Spurlock and Kisman arrived back at work, and went upstairs to punch out. Robert McCrea asked for Deaconn Spurlock to go into his office. Deaconn Spurlock came out and told Kisman that Robert wanted all of Kisman's hospital paperwork. Kisman refused, because it was put on Kisman's own insurance as UPS management were claiming it was not worker compensation related. Deaconn Spurlock and Kisman punched out and walked out.

117.    As Deaconn Spurlock and Kisman were walking through the crosswalk, Robert called Deaconn Spurlock again and demanded Kisman's paperwork.  Kisman again declined and asked Robert McCrea to not violate his HIPAA rights.

118.    On or about November 2, 2020, Deaconn Spurlock sent Kisman a text message letting him know that UPS was sending him two more discharge letters, as Robert McCrea had just had a meeting with Deaconn Spurlock.

119.    On or about November 3, 2020, Kisman texted Michelle regarding his start time on 10-29-20, as Kisman knew UPS would try and use the late punch in against him when Ivis did not let Kisman punch in on time. Michelle replied, "yes, I will remember."

120.    On or about November 4, 2020, Kisman arrived and completed the Echocardiogram at Renown Hospital. The counselor instructed Kisman to get disability forms and the counselor would put Kisman out on disability, so things could calm down. Kisman called Hartford and Hartford sent the paperwork for doctor to fill out.

121.    On or about November 6, 2020, Kisman met with his regular doctor to review results from the Echocardiogram. Based on the heart looking good and no left side swelling, the doctor completed exam (BP 124/72) and wrote Kisman a return to work note "Fit For Duty" for 11-9-20.

122.    On or about November 2 and 10, 2020, Kisman received two more termination letters. One was for being late and one for being unfit to drive.

123.    On or about November 12, 2020, Kisman finally put the remainder of documents together to send to OSHA and sent out FedEx. Kisman went to work and found that there was going to be another meeting, only this time UPS was having Scott Tucker hold the meeting. At this meeting was

Scott Tucker, Larry Powers for UPS, Deaconn Spurlock and Kisman. Scott Tucker had been told to review the past two termination letters with Kisman. Scott Tucker, Larry Powers, Deaconn Spurlock and Kisman all spoke calmly, and Larry Powers confirmed what Larry Cooper had done and said. Kisman expressed how upsetting this was and that it was all in retaliation for hi snumerous safety-related complaints, the OSHA investigation in particular. Kisman had Deaconn read the FedEx receipt address and to whom it was sent (OSHA) and the weight.  At no time did anyone ask for a new DOT card or even a return to work or fit for duty letter. Kisman was given keys and sent to Ontario.

124.    The following day Kisman was awoken by Scott Tucker's text message at the Ontario hotel. Scott Tucker's text asked if Kisman had got a "New DOT Card." Kisman responded, "No," then called him about 10 minutes later to see what was going on. Scott Tucker said Phil Cote had asked to see Kisman's "New DOT Card." Kisman's shift started at 2:54pm and he left Ontario at 3:32pm.

125.    Around 5pm Kisman received another call from Scott Tucker asking where Kisman was. Kisman told Scott Tucker he was by Johannesburg. Scott Tucker said he would call Kisman back. Scott Tucker called right back asking if Kisman had a loaded trailer or not. Kisman was pulling an empty trailer. Scott Tucker told Kisman that Phil Cote wanted him to pull over and UPS was sending a tow truck to tow him all the way back to Reno, because he did not have a "New DOT Card." Scott Tucker told Kisman to go ahead and call when he got to a safe haven.  Kisman called Scott Tucker at 6:56pm stating that he was in Pearsonville, CA. Scott Tucker said, "OK and UPS was sending a tow truck." Tow truck arrived about 9pm.

126.    Kisman called Debbie Calkins and Polly Antes and had conversations with both as to what was happening. This was the first time that Kisman heard that Debbie Calkins had texted Phil Cote saying that Kisman knew he had to get a new DOT card. Kisman sent Polly Antes a copy of his fit for duty letter from the doctor, and Debbie Calkins went over to Polly Antes home to pick it up the letter. Debbie Calkins tried to get hold of Phil Cote but they did not talk.

127.    Kisman's shift started at 2:54pm Friday and did not end until 7:20am Saturday. The day was 16hrs and 26min long. Kisman was in severe pain, as the edema to his left leg was painful and the swelling left him limping home. (Kisman has been under FMLA for over 7 years due to permanent tissue damage to his left lower leg.) UPS continued to attack Kisman's knowing his physical and

psychological health conditions, in flagrant attempts to intentionally cause him harm. This was the final straw and his counselor submitted the paperwork to put Kisman out on disability leave.

128.    On or about November 19, 2020, Kisman went out on disability leave.

129.    On or about November 21, 2020, Kisman received four more discharge letters. These discharges were from 10-29-2020 and 11-12-2020. The retaliation and harassment was at an all time high, and Kisman was even denied access to his personal time cards and all UPS documents.

130.    On or about November 24, 2020,  Kisman received the thumb drive back from OSHA. It was shortly after this that Brian Morgan (OSHA investigator) had to tell Kisman that Brian Morgan's supervisor would no longer allow the expanded scope of the investigation even though Brian Morgan had copied and reviewed all the information sent by Kisman.

131.    Hartford changed the Leave to Disability on or about November 30, 2020. Hartford then canceled the FMLA, as the claim was changed to disability 12-22-20.

132.    On or about December 16, 2020, Kisman's counselor extended his disability leave to January 11, 2021. Kisman's disability leave was only for the stress and anxiety/depression caused by UPS work conditions—and the hostile work environment. The counselor never indicated that Kisman had any other limitations that would prevent Kisman from being physically active.

133.    On January 11, 2021, his counselor signed off allowing Kisman to return to work on the 12th. Kisman immediately went to Renown to get "NEW DOT PHYSICAL" so there would be no problems. This physical was only good for one year, because Kisman was taking blood pressure medication and the certificate stated "Hypertension." Kisman called UPS and spoke with Emery in dispatch to verify that this was all Kisman needed to return to work. Emery said, "yes."

134.    On Tuesday, January 12, 2021, Kisman texted Debbie Calkins reminding her of his start time and asking that she be present for his return back to work. Debbie Calkins texted back that she would not be available at 5pm. Kisman left early for work and even called on drive in, and spoke with Nick in dispatch letting him know what items Kisman would need and that Kisman just wanted things to go smoothly.

135.    When Kisman arrived at work, he was told to wait as Robert needed to have a meeting with him. He waited in dispatch and soon Deaconn Spurlock arrived and went into Robert McCrea's

office. Robert McCrea asked if Kisman's disability would keep him from doing his job. Kisman gave Robert McCrea his "new DOT physical" and stated that he did not feel comfortable sharing his medical records without legal representation. Kisman also stated that there was nothing physically that would prohibit him from doing his job. Robert McCrea then stated that Kisman was being discharged for dishonesty and for theft. Deaconn Spurlock asked, "What for?" Robert McCrea stated, "while on disability, UPS had a private investigator follow Kisman and video tape him working and moving trailers and packages for Kisman's son's company." Deaconn Spurlock then asked, "What about the discharge for theft?" Robert McCrea said that because Kisman's health insurance was being paid for during Kisman's time off on disability that this was considered theft. Robert then asked for Kisman's UPS ID and walked Kisman off property.

136.   On or about January 15, 2021, Kisman received a discharge letter for what Robert McCrea had discharged Kisman for on January 12, 2021.

137.   Kisman continued to meet with his counselor weekly during the next month or so.

138.   UPS requested that all the discharges go to Panel at the same time. The Union and UPS entered into pre-Panel meetings and met three times for over 17 hours just in pre-Panel.

139.   As the Panel hearing neared, Debbie Calkins requested letters from Kisman's counselor and dates of meetings. There were many discussions of what was considered "work," because Kisman was not paid by GFI and would not receive any compensation until July 31, 2021—after Kisman could retire from UPS. This was done so that Kisman was not compensated and, therefore, was not "working." This definition was agreed to by the Union and Lorie UPS labor representative on December 4, 2018.

140.   Debbie Calkins called and asked Kisman if he would be willing to fire his attorney and drop all OHSA cases and lawsuits if UPS would allow him to return to work for 50 days to reach his retirement. Kisman said, "No." Kisman asked Debbie Calkins several times to put this offer by UPS in writing, but she would not. Debbie Calkins explained that this offer was made "off the record" by Veronica UPS labor.

141.   On or about February 12, 2021 Kisman filed OSHA complaint #ECN71978 for retaliation as suggested by Brian Morgan. The biggest delay in moving forward with the pre-Panel was

due to UPS not giving the Union the information that had been requested.

142.    Finally, on or about February 19, 2021UPS gave the Union the documents. Kisman received a copy of the following documents on this date:

1. Copy of Private investigators report and video from July (back injury);

2. Copy of letter from Mike Stenson to Phil Cote;

3. Copy of letter from Robert McCrea to Phil Cote (multiple);

4. Copy of letter from Larry Cooper to Phil Cote;

5. Copy of letter from Larry Powers to Phil Cote (multiple);

6. Copy of letter from Scott Tucker to Phil Cote;

7. Copy of Private Investigators report and video from December (back injury);

143.    Kisman then provided Debbie Calkins with a letter from his counselor on or about February 16, 2021, which the counselor updated on February 23, 2021 making it very clear as to why Kisman was out on disability, e.g. his mental health. Also, on or about February 16, 2021, the counselor updated a list of therapy sessions completed.

144.    During the pre-Panel meetings both Jeremy Cox and Deaconn Spurlock were amazed at UPS's false accusations and misrepresentations of the facts. At one point Larry Cooper was brought in to answer questions. Larry Cooper was asked if he had seen Kisman take the pictures he had accused Kisman of taking at the Home Depot. Larry Cooper said, "no."

145.    Larry Cooper was asked about the police report that Larry Cooper filed against Kisman. Larry Cooper responded that Larry Cooper was unable to file one, because Kisman had not actually threatened him. Larry Cooper attempted to file a police report and/or a restraining order through a family member who works for the Washoe County Sheriffs department.

146.    Larry Cooper was told that Kisman never took pictures of him or his wife. Larry Cooper responded, "If Kisman didn't then who did?"

147.    Larry Cooper was asked who told him that Kisman had taken these photos of him and used them in a panel case with Debbie Calkins and Jeremy Cox. Larry Cooper said, "Robert McCrea." Even the signed letters from Robert McCrea, Larry Cooper and Larry Powers exclude the facts of what transpired.

148.     Moving forward, the Panel hearing began Monday, March 8, 2021 at 1:30pm and continued until March 11, 2021 at 11am. There were 11 cases; and UPS began dropping some of them, because the evidence was overwhelming showing them to be wrong and false in their actions to discharge. Some of the cases UPS put together because it was the same date and discharge just reworded, so they would have a second chance at discharging Kisman.

149.     During the first two days, Kisman won every case. On day three, the Panel was becoming upset with the length of time being used up. Other cases were waiting with witnesses for two days at other Teamster offices. The second-to-last case was sent to arbitration and the last case finished at 5pm on Wednesday March 10, 2021, but no decision was made.

150.     The Panel resumed Thursday, March 11, 2021 with the Panel in executive session until almost 11am. The Panel upheld UPS's decision to discharge, because the counselor's note did note state that Kisman could work elsewhere. UPS changed their stance from December 4, 2018, and now said work is work—compensated or not. Meanwhile, many other employees are working and being compensated elsewhere (even UPS on-road supervisors, who drive and train).

151.     Ultimately, Plaintiff's employment with Defendant UPS was unlawfully terminated without real, substantial, and legitmate reason. Instead, Defendants unlawfully terminated his employment due to concerns related to his age and disability, and in retaliation for exposing and complaining about numerous safety violations.

152.     Due to Plaintiff's sudden and wrongful termination, Plaintiff has suffered, and continues to suffer, severe emotional distress, including, but not limited to, emotional distress, anxiety, depression, humiliation, physical and mental suffering.

**FIRST CAUSE OF ACTION**

**AGE DISCRIMINATION**

**AGAINST DEFENDANT UPS**

**[Cal. Gov't Code §§12940(a), (c) and 28 USCS § 1346, et. seq.];**

153.     Plaintiff alleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint as if fully set forth herein.

154.    Plaintiff was at all times hereto an "employee" within the meaning of California Government Code § 12926(c) and California Government Code § 12940(a) and (c) and also the ADEA, which prohibit age discrimination in employment.

155.    Defendant UPS was at all material times an "employer" as defined by California Government Code § 12926(d) and within the meaning of ADEA and California Government Code § 12940(a) and (c) and, as such, was barred from discriminating or retaliating in employment decisions on the basis of age as set forth in California Government Code § 12940 and ADEA.

156.    Defendant UPS discriminated against Plaintiff on the basis of his age in violation of California Government Code § 12940(a) and (c), Article I of the California Constitution, ADEA, and related statutes by engaging in the course of conduct more fully set forth in the General Allegations stated above.

157.    As a result of Defendant's unlawful discrimination against Plaintiff, Plaintiff has suffered and continues to suffer (a) substantial humiliation, serious mental anguish, and emotional and physical distress; and (b) loss of past and future earnings, and employment benefits and opportunities, all on account of which Plaintiff is entitled to compensatory damages.  The exact amount and nature of such damages exceeds the jurisdictional limits of this court, but are presently unknown to Plaintiff, who will either seek leave to amend this Complaint upon ascertaining such information, or prove the same at the time of trial.

158.    As more fully set forth above, the age discrimination by Defendant UPS was committed intentionally, maliciously, wantonly, oppressively, and fraudulently with a conscious disregard for Plaintiff's rights and with the intent to vex, injure, punish, and annoy Plaintiff so as to cause the injuries sustained by Plaintiff, which acts amounted to oppression, fraud, and malice, as described in California Civil Code § 3294.  Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendant.

\\

\\

**SECOND CAUSE OF ACTION**

**DISABILITY DISCRIMINATION**

**AGAINST DEFENDANT UPS**

**[Cal. Gov't Code §§12940(a), (c) and 29 C.F.R § 1630.4]**

159.     Plaintiff alleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint as if fully set forth herein.

160.     Plaintiff was at all times hereto an "employee" within the meaning of ADA and California Government Code § 12926(c) and California Government Code §§ 12940(a) and (c), which prohibit disability discrimination in employment.

161.     Defendant UPS was at all material times an "employer" as defined by ADA and California Government Code § 12926(d) and within the meaning of California Government Code §§ 12940(a) and (c) and, as such, was barred from discriminating in employment decisions on the basis of disability, as set forth in California Government Code § 12940.

162.     Defendant UPS has discriminated against Plaintiff on the basis of his disability in violation of California Government Code §§ 12940(a) and (c), Article I of the California Constitution, ADA, and related statutes, by engaging in the course of conduct more fully set forth in the General Allegations and all paragraphs stated above.

163.     As a result of Defendant UPS's unlawful discrimination against Plaintiff, Plaintiff has suffered and continues to suffer (a) substantial humiliation, serious mental anguish, emotional and physical distress; and (b) loss of past and future earnings, and employment benefits and opportunities, on account of which Plaintiff is entitled to compensatory damages. The exact amount and nature of such damages exceed the jurisdictional limits of this court, but are presently unknown to Plaintiff, who will either seek leave to amend this Complaint upon ascertaining such information, or will prove the same at the time of trial.

164.     As more fully set forth above, the disability discrimination by Defendant UPS was committed intentionally, maliciously, wantonly, oppressively, and fraudulently with

a conscious disregard for Plaintiff's rights and with the intent to vex, injure, punish, and annoy Plaintiff so as to cause the injuries sustained by Plaintiff. Such acts amounted to oppression, fraud, and malice, as described in California Civil Code § 3294. Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendant.

### THIRD CAUSE OF ACTION

### FAILURE TO ACCOMMODATE DISABILITY

### AGAINST DEFENDANT UPS

### [Cal. Gov't Code §12940(m)(1) and 29 C.F.R §§ 1630.4, 1630.2(o)]

165.	Plaintiff alleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint.

166.	Plaintiff at all times hereto was an "employee" within the meaning of ADA and California Government Code § 12926(c) and California Government Code §§12940 (a) and (c), which prohibit disability/medical condition harassment/discrimination in employment.

167.	Defendant UPS was at all material times an "employer" within the meaning of ADA and California Government Code §12926(d) and California Government Code §§12940(a) and (c), and, as such, was barred from harassing/discriminating against Plaintiff on the basis of disability, perceived disability, or medical condition possessed or thought to be possessed by an employee, as set forth in California Government Code §12940.

168.	At the time of Plaintiff's employment with Defendant UPS, he was suffering from a condition that substantially limits his major life activities.

169.	Despite having knowledge of Plaintiff's condition, Defendant UPS failed to provide Plaintiff with a reasonable accommodation for the above condition.

170.	As a proximate result of Defendant UPS'S failure to accommodate Plaintiff's known health conditions, Plaintiff has suffered (a) humiliation, serious mental anguish, and emotional and physical distress; and (b) loss of past and future earnings, and

employment benefits and opportunities; all on account of which Plaintiff is entitled to compensatory damages. The amount and nature of such damages exceed the jurisdictional limits of this court, but are presently unknown to Plaintiff, who will either seek leave to amend this Complaint upon ascertaining such information, or will prove the same at the time of trial.

171.     As more fully set forth above, Defendant UPS's failure to accommodate Plaintiff's known serious health conditions was committed intentionally, maliciously, wantonly, oppressively, and fraudulently with a conscious disregard of Plaintiff's rights and with the intent to vex, injure, punish, and annoy Plaintiff so as to cause the injuries sustained by Plaintiff. Such acts amounted to oppression, fraud, and malice, as described in California Civil Code § 3294. Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendant.

**FOURTH CAUSE OF ACTION**

**FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS**

**AGAINST DEFENDANT UPS**

**[California Government Code § 12940(n) and 29 C.F.R §1630.2(o)]**

172.     Plaintiff realleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint.

173.     Under ADA and California Government Code § 12940 (n), Defendants had an affirmative duty to engage in a timely, good faith, interactive process with employees to determine effective reasonable accommodations in response to a request by an employee with a known physical disability or medical condition.

174.     Defendants terminated Plaintiff's employment. At no time before Plaintiff's termination did Defendants engage in an interactive process to explore, identify, and discuss appropriate reasonable accommodations with Plaintiff.

175.     Defendants' breach of the affirmative duty was a substantial factor in causing harm to Plaintiff.

176.     At all relevant times alleged herein, Defendants were acting within the scope and

purpose of their employment or agency, and with the power and authority vested in them, or ratification, endorsement, or approval of the conduct by Defendants.

177.    As a proximate result of Defendants' breach of duties, Plaintiff has suffered and continues to suffer past and future lost earnings, employment benefits, opportunities, and experience, and other special and compensatory damages, along with prejudgment interest.

178.    As a further proximate result of Defendants' breach of duties, Plaintiff has suffered and continues to suffer financial damage and hardship, along with physical, mental, and emotional anguish, distress, pain, and suffering, loss of enjoyment of life, inconvenience, grief, anxiety, humiliation, worry, shock, and embarrassment, and other economic and non-economic losses.

179.    As a further proximate result of Defendants' breach of duties, Plaintiff is entitled to recover prevailing party attorney fees and costs pursuant to, among other laws, Government Code § 12965(b) and ADA.

180.    The conduct of Defendants, by and/or ratified by managing agents, was performed with the intent to cause injury, was despicable and a willful, knowing, and deliberate disregard for the rights and well-being of Plaintiff, which subjected him to cruel and unjust hardship, and which was so vile, base, or contemptible that it would be looked down on and despised by reasonable people. Defendants further intentionally misrepresented or concealed material facts with the intent to and which did cause harm to Plaintiff. Defendants' conduct constitutes malice, oppression, and/or fraud as defined in California Civil Code § 3294, entitling Plaintiff to an award of punitive or exemplary damages in an amount sufficient to punish and deter Defendants.

## FIFTH CAUSE OF ACTION

### FAMILY AND MEDICAL LEAVE DISCRIMINATION AND RETALIATION
### AGAINST DEFENDANT UPS

181.    Plaintiff alleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint.

182.     Under the Family Medical Leave Act ("FMLA") and the Fair Employment and Housing Act ("FEHA"), Government Code §12940 et seq., and more specifically, the California Family Rights Act ("CFRA"), it is an unlawful employment practice for an employer to refuse to grant a request by any employee to take up to 12 workweeks in any 12 month period for family and medical leave.  It is an unlawful employment practice for the employer to fail to guarantee, to each employee taking family or medical leave employment in the same or comparable position at the end of the family or medical leave. It is an unlawful employment practice for an employer to refuse to hire, to discharge, fine, suspend, expel, discrimination or harass an employee because of an employee's exercise of the right to family care and medical leave.

183.     At all times mentioned in this complaint, Defendant UPS was employer and employed more than 50 employees in a 75 mile radius of plaintiff's place of work.

184.     Plaintiff's protected status under the FMLA and FEHA is Plaintiff's exercise of and/or attempts to exercise family and/or medical leave rights, and/or Plaintiff giving information and/or testimony in an inquiry and/or proceedings related to rights guaranteed under the California Family Rights Act.  Plaintiff complied with all applicable notice requirements, if any, of Defendant UPS, and of the California Family Rights Act and FMLA.

185.     Defendant UPS knew, perceived, and/or believed that Plaintiff had the aforementioned protected status, described hereinabove.

186.     Defendant UPS failed and refused to comply with the California Family Rights Act and FMLA, as described hereinabove. Defendant UPS failed to guarantee Plaintiff's employment in the same or comparable position at the end of family or medical leave; and/or refused to hire, discharged, fined, suspended, expelled, demoted, constructively discharged, refused to promote, failed to reinstate, discriminated against and/or harassed Plaintiff because of Plaintiff's exercise of and/or attempts to exercise family and/or medical leave rights under the California Family Rights Act and FMLA.

187.     Plaintiff's exercise of his medical leave rights due to serious health condition was

a motivating factor in Defendant UPS aforementioned decisions that were adverse to Plaintiff.

188.     As a direct, legal, and proximate cause of Plaintiff's aforementioned protected status, Defendants discriminated and harassed Plaintiff by engaging in the course of conduct set forth in the General Allegations and all paragraphs stated above, amongst other things.

189.     As a result of Defendants' above referenced discrimination, harassment, and retaliation, Plaintiff has suffered and continues to suffer (a) substantial humiliation, serious mental anguish, and emotional and physical distress; and (b) loss of past and future earnings, and employment benefits and opportunities, on account of which Plaintiff is entitled to compensatory damages.  The exact amount and nature of such damages exceed the jurisdictional limits of this court, but are presently unknown to Plaintiff, who will either seek leave to amend this Complaint upon ascertaining such information, or will prove the same at the time of trial.

190.     As more fully set forth above, Defendant UPS above referenced discrimination, harassment, and retaliation was committed intentionally, maliciously, wantonly, oppressively, and fraudulently with a conscious disregard for Plaintiff's rights and with the intent to vex, injure, punish, and annoy Plaintiff so as to cause the injuries sustained by Plaintiff.  Such acts amounted to oppression, fraud, and malice, as described in California Civil Code § 3294.  Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendant.

## SIXTH CAUSE OF ACTION

### RETALIATION FOR COMPLAINTS OF DISCRIMINATION AND HARASSMENT AGAINST DEFENDANT UPS

**[Gov't Code §12940(h) and 28 USCS § 633(a), et seq.]**

191.     Plaintiff re-alleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint as if fully set forth herein.

192.     In violation of California Government Code § 12940(h), Defendants retaliated

against Plaintiff by terminating Plaintiff's employment after he reported the seemingly increasing events of discrimination and harassment against his, as more fully set forth in the General Allegation and all paragraphs stated above, among other things.

193.     As a direct and proximate result of Defendants' retaliatory actions against Plaintiff,  Plaintiff suffered and continues to suffer substantial (a) humiliation, serious mental anguish and emotional and physical distress; and (b) loss of past and future wages, and employment benefits and opportunities, on account of which Plaintiff is entitled to compensatory damages, the exact amount and nature of which exceeds the jurisdictional limits of this court but is presently unknown to Plaintiff, who will either seek leave to amend this complaint upon ascertaining such information, or will prove the same at the time of trial.

194.     As more fully set forth above, Defendants' retaliatory actions were willful, wanton, malicious, and oppressive and committed with the intent to cause the injuries sustained by Plaintiff, within the meaning of California Civil Code § 3294.  Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example of Defendant.

### SEVENTH CAUSE OF ACTION

### WHISTLEBLOWER RETALIATION

### AGAINST DEFENDANT UPS

[California Labor Code § 1102.5]

195.     Plaintiff alleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint.

196.     Plaintiff was wrongfully discharged for her whistle-blowing action, in violation of California Labor Code § 1102.5. Specifically, Plaintiff was retaliated against and terminated for reporting and/or refusing to participate in Defendant's unlawful and illegal practices.

197.     By wrongfully discharging Plaintiff, without cause or justification, and for the retaliatory reasons set forth above, Defendants acted willfully and with malice towards

COMPLAINT

Plaintiff.

198.     As a direct and proximate result of Defendants' retaliatory actions against Plaintiff, Plaintiff suffered (a) humiliation, serious mental anguish, and emotional and physical distress to his damage in a sum yet to be ascertained and (b) loss of past and future wages, and employment benefits and opportunities, on account of which Plaintiff is entitled to compensatory damages, the exact amount and nature of such loss which is presently unknown to Plaintiff, who will either seek leave to amend this Complaint upon ascertaining such information, or will prove same at the time of trial.

199.     As more fully set forth above, the retaliation by Defendants  was done intentionally, maliciously, wantonly, oppressively, and fraudulently with a conscious disregard for Plaintiff' rights and with the intent to vex, injure, punish, and annoy Plaintiff so as to cause the injuries sustained by Plaintiff, within the meaning of California Civil Code § 3294.  Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendants.

## EIGHTH CAUSE OF ACTION

## WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY

## AGAINST DEFENDANT UPS

200.     Plaintiff re-alleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint as if fully set forth herein.

201.     Defendants violated the FLSA, California Labor Code, ADA, ADEA, FMLA, STAA, and/or Fair Employment and Housing Act (FEHA), California Government Code § 12940 et seq. by wrongfully terminating Plaintiff's employment because of his complaints of illegal activities, age and/or disability.

202.     The aforementioned acts of Defendants constitute wrongful termination in violation of public policy.

203.     As a result of Defendants' wrongful conduct, Plaintiff has suffered and continues to suffer from (a) substantial humiliation, serious mental anguish, emotional and physical distress, (b) loss of past and future earnings, employment benefits and opportunities,

which Plaintiff is entitled to as compensatory damages.  The exact amount and nature of such damages exceed the jurisdictional limits of this court, but are presently unknown to Plaintiff, who will either seek leave to amend this Complaint upon ascertaining such information or will prove the same at the time of trial.

204.     As more fully set forth above, the acts of Defendants were intentional, malicious, wanton, oppressive and fraudulent, with conscious disregard for Plaintiff's rights and with the intent to vex, injure, punish and annoy Plaintiff so as to cause the injuries sustained by Plaintiff, within the meaning of California Civil Code § 3294. Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendants.

### NINTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### AGAINST DEFENDANT UPS

205.     Plaintiff alleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint.

206.     Defendants engaged in age and disability harassment, discrimination and retaliation against Plaintiff, and aided and abetted each other in engaging in illegal discrimination harassment, and retaliation thereby subjecting Plaintiff to the intentional infliction of emotional distress caused by such retaliation, discrimination and harassment in violation of FLSA, California Labor Code, ADA, ADEA, FMLA, STAA, and/or Fair Employment and Housing Act (FEHA), California Government Code § 12940 et seq.

207.     Defendants failed to take immediate and appropriate remedial action to respond to Plaintiff's complaints of discrimination and harassment.  Instead, Defendant UPS ignored Plaintiff's request that the behavior be dealt with and allowed Plaintiff to be subjected to retaliatory action.

208.     The acts of Defendants as described herein were extreme and outrageous and an abuse of the authority and position of Defendants, and each of them.  Such conduct was intended to cause severe emotional distress, or was done with conscious disregard for the

probability of causing such distress.  This exceeded the inherent risks of employment and was not the sort of conduct normally expected to occur in the workplace.  Defendant UPS and their employees, the above-named individual Defendants, abused their positions of authority toward Plaintiff, and engaged in conduct intended to humiliate Plaintiff and convey the message that he was powerless to defend his rights.

209.     As a proximate result of the aforementioned acts, Plaintiff has suffered embarrassment, anxiety, humiliation, serious mental anguish, and emotional and physical distress.  Plaintiff will continue to suffer damages in a sum that exceeds the jurisdictional limits of this court, but is yet to be ascertained.  Plaintiff will either seek leave to amend this Complaint upon ascertaining such information, or will prove the same at the time of trial.

210.     As more fully set forth above, the acts of Defendants were intentional, malicious, wanton, oppressive, and fraudulent, with conscious disregard for Plaintiff's rights and with the intent to vex, injure, punish, and annoy Plaintiff so as to cause the injuries sustained by Plaintiff, within the meaning of California Civil Code § 3294.  Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendants.

**TENTH CAUSE OF ACTION**

**NEGLIGENCE**

**AGAINST DEFENDANT UPS**

211.     Each of the above paragraphs contained in this Complaint is hereby incorporated by reference at this point as if set forth herein full at length.

212.     In carrying out the above conduct, Defendants, and their employees and agents, breached the duty owed to Plaintiff to provide a workplace free from discrimination, harassment, and retaliation, and abused their positions of authority towards Plaintiff. Said conduct exceeded the inherent risks of employment and was not the sort of conduct normally expected to occur in the workplace.

213.     Defendants, and their employees and agents knew, or should have known that the

above conduct would cause Plaintiff serious emotional distress. As a proximate result of Defendants negligent conduct, Plaintiff suffered and will continue to suffer extreme humiliation, embarrassment, anxiety, mental anguish, and emotional distress in an amount according to proof.

**TWELFTH CAUSE OF ACTION**

**RETALIATION FOR COMPLAINTS OF FLSA VIOLATIONS**

**AGAINST DEFENDANT UPS**

**[29 U.S.C.S. § 215(a)(3)]**

214.     Plaintiff re-alleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint as if fully set forth herein.

215.     Plaintiff was wrongfully discharged for her whistle-blowing action, in violation of **29** U.S.C.S. § 215(a)(3). Specifically, Plaintiff was retaliated against and terminated for reporting and/or refusing to participate in Defendant's unlawful and illegal practices in violation of FLSA.

216.     By wrongfully discharging Plaintiff, without cause or justification, and for the retaliatory reasons set forth above, Defendants acted willfully and with malice towards Plaintiff.

217.     As a direct and proximate result of Defendants' retaliatory actions against Plaintiff, Plaintiff suffered (a) humiliation, serious mental anguish, and emotional and physical distress to his damage in a sum yet to be ascertained and (b) loss of past and future wages, and employment benefits and opportunities, on account of which Plaintiff is entitled to compensatory damages, the exact amount and nature of such loss which is presently unknown to Plaintiff, who will either seek leave to amend this Complaint upon ascertaining such information, or will prove same at the time of trial.

218.     As more fully set forth above, the retaliation by Defendants was done intentionally, maliciously, wantonly, oppressively, and fraudulently with a conscious disregard for Plaintiff' rights and with the intent to vex, injure, punish, and annoy Plaintiff so as to cause the injuries sustained by Plaintiff, within the meaning of

California Civil Code § 3294. Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example out of Defendants.

## TWELFTH CAUSE OF ACTION

### RETALIATION FOR COMPLAINTS OF OSHA AND STAA VIOLATIONS AGAINST DEFENDANT UPS

**[Violation of Labor Code § 6310 and 49 USCS § 31105]**

219.     Plaintiff re-alleges and incorporates herein by this reference each and every allegation set forth in all previous paragraphs of the Complaint as if fully set forth herein.

220.     Plaintiff was ultimately and unlawfully discharged by Defendants as retaliation against Plaintiff, in violation California Labor Code §§ 6310(a)(1) and §6311 and also 49 USCS § 31105 (STAA). Specifically, Plaintiff was retaliated against and terminated because he complained and reported to his employer and to OSHA Defendants illegal practices, including but not limited to OSHA and Labor Code violations.

221.     Under California Labor Code § 6310 (a) and 49 USCS § 31105, No person shall discharge or in any manner discriminate against any employee because the employee has done any of the following: (1) Made any oral or written complaint to the division, other governmental agencies having statutory responsibility for or assisting the division with reference to employee safety or health, his or her employer, or his or her representative.

222.     Under California Labor Code § 6311 and 49 USCS § 31105, no employee shall be laid off or discharged for refusing to perform work in the performance of which this code, including Section 6400, any occupational safety or health standard or any safety order of the division or standards board will be violated, where the violation would create a real and apparent hazard to the employee or his or her fellow employees. Any employee who is laid off or discharged in violation of this section or is otherwise not paid because he or she refused to perform work in the performance of which this code, any occupational safety or health standard or any safety order of the division or standards board will be violated and where the violation would create a real and apparent hazard to the employee or his or her fellow employees shall have a right of action for wages for the time the

COMPLAINT

employee is without work as a result of the layoff or discharge.

223.     By wrongfully discharging Plaintiff, without cause or justification, and for the retaliatory reasons set forth above, Defendants acted willfully and with malice towards Plaintiff.

224.     As a result of Defendant's retaliation of Plaintiff, Plaintiff has suffered and continues to suffer substantial (a) humiliation, serious mental anguish, and emotional and physical distress; and (b) loss of past and future earnings, and employment benefits and opportunities, on account of which Plaintiff is entitled to compensatory damages.  The exact amount and nature of such damages exceed the jurisdictional limits of this court, but are presently unknown to Plaintiff, who will either seek leave to amend this Complaint upon ascertaining such information, or will prove the same at the time of trial.

225.     As more fully set forth above, Defendant Service Bros. Transport's retaliatory acts were committed intentionally, maliciously, wantonly, and oppressively, with a conscious disregard of Plaintiff's rights and with the intent to vex, injure, punish, and annoy Plaintiff so as to cause the injuries sustained by Plaintiff, as described in California Civil Code § 3294.  Plaintiff is therefore entitled to punitive or exemplary damages in an amount sufficient to punish and make an example of Defendant Service Bros. Transport.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.      Compensatory and actual damages in an amount to be proven at the time of trial;

2.      For costs of the suit incurred herein;

3.      For punitive and exemplary damages in an amount to be proven at the time of trial;

4.      For reasonable attorneys' fees under the FLSA, California Labor Code, ADA, ADEA, FMLA, STAA, and/or Fair Employment and Housing Act (FEHA) and all related statutes, including but not limited to California Government Code § 12965(b) and Labor Code § 1102.5; and Cal. Code of Civil Procedure § 1021;

5.  For pre- and post-judgment interest at the prevailing statutory rates;

6.  A declaratory judgment that the practices complained of in this Complaint are unlawful under California and/or Federal law;

7.  An injunction against Defendants, their officers, agents, successors, employees, representatives, and any and all person acting in concert with them from engage in each of the practices complained of in this Complaint; and

8.  For such other relief as the court may deem proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for the causes of action set forth herein.

Dated: April 13, 2021

CANTOR LAW
A PROFESSIONAL LAW CORPORATION

By:  /s/ Zachary Cantor
ZACHARY CANTOR, ESQ.,
Attorney for Plaintiff Shane Kisman